**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GEOFF WINKLER, Receiver,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>THOMAS D. MCCLOSKEY, Jr.;<br>BONNIE MCCLOSKEY;<br>CORNERSTONE HOLDINGS, LLC,<br>a Colorado limited liability company;<br>MCCLOSKEY TRUST,<br>    *Defendants-Appellants*,<br><br>and<br><br>DOES, 1-10, inclusive,<br>    *Defendant*. | No. 22-55856<br><br>D.C. No.<br>2:21-cv-05757-<br>FMO-AFM<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted July 18, 2023
Pasadena, California

Filed September 28, 2023

Before:  A. Wallace Tashima and Danielle J. Forrest, Circuit Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Tashima

## SUMMARY[**]

### Arbitration

The panel reversed the district court's order denying a motion to compel arbitration and remanded for further proceedings in a fraudulent transfer action.

The district court appointed a receiver to claw back profits received by investors in a Ponzi scheme that was the subject of a Securities and Exchange Commission enforcement action.  The receiver filed suit against certain investors, alleging fraudulent transfers from the receivership entities to the investors.  The district court concluded that the receiver was bound by arbitration agreements signed by the receivership company that was the instrument of the Ponzi scheme.  The district court relied on *Kirkland v. Rune (In re EPD Investment Co.)*, 821 F.3d 1146 (9th Cir. 2016), which affirmed the bankruptcy court's denial of a motion to compel arbitration of a bankruptcy trustee's action to avoid fraudulent transfers by the bankruptcy debtors, who ran a

---

[*] The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Ponzi scheme, to the defendants, who invested in the scheme.

The panel held that *EPD* did not control because it addressed whether a bankruptcy trustee, not a receiver, was bound by an arbitration agreement. Unlike under bankruptcy law, there was no explicit statute here establishing that the receiver was acting on behalf of the receivership entity's creditors. The panel held that a receiver acts on behalf of the receivership entity, not defrauded creditors, and thus can be bound by an agreement signed by that entity. But here, even applying that rule, it was unclear whether the receiver was bound by the agreements at issue. The panel remanded for the district court to consider in the first instance whether the defendant investors met their burden of establishing that the fraudulent transfer claims arose out of agreements with the receivership entity, whether the investors were parties to the agreements, and any other remaining arbitrability issues.

## COUNSEL

Joel D. Bertocchi (argued), Akerman LLP, Chicago, Illinois; Michael D. Napoli, Akerman LLP, Dallas, Texas; Ellen S. Robbins, Akerman LLP, Los Angeles, California; for Defendants-Appellants.

Matthew D. Pham (argued), David R. Zaro, Joshua A. del Castillo, and Michael R. Farrell, Allen Matkins, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

TASHIMA, Circuit Judge:

We must decide whether a receiver who is appointed to claw back profits received in a Ponzi scheme is bound by arbitration agreements signed by the receivership company that was the instrument of the Ponzi scheme.[1]  The district court, relying on *Kirkland v. Rund (In re EPD Investment Co.)*, 821 F.3d 1146 (9th Cir. 2016), concluded that the receiver was not bound by the arbitration agreements.  *EPD*, however, addressed whether a bankruptcy trustee, not a receiver, was bound by an arbitration agreement; it, therefore, does not control here.  We conclude that a receiver acts on behalf of the receivership entity and thus can be bound by an agreement signed by that entity.  But here, even applying that rule, it is unclear whether Appellee Geoff Winkler ("Receiver") is bound by the agreements at issue. We therefore reverse the district court order denying the

---

[1] A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."

*Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting *Wyle v. C.H. Rider & Fam. (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991)).  Suits seeking to recover false profits in Ponzi schemes from investors who made money, "so that the excess proceeds can be redistributed to the investors who lost money," are known as "'clawback' lawsuits."  *Wiand v. Schneiderman*, 778 F.3d 917, 920 (11th Cir. 2015).

motion to compel arbitration and remand for further proceedings.

## BACKGROUND

Ralph Iannelli operated a Ponzi scheme through his equipment leasing business, Essex Capital Corporation ("Essex"). In June 2018, the Securities and Exchange Commission ("SEC") filed an enforcement action against Essex, alleging that Iannelli, a "securities fraud recidivist," raised $80 million from approximately seventy investors through Essex, based on false and misleading representations.[2]

The district court appointed Winkler as the Receiver over Essex and its subsidiaries and affiliates (collectively, the "receivership entities") and authorized him to undertake disgorgement efforts. The Receiver was authorized to pursue the recovery of profits from so-called net winners – investors who were paid more than they invested in the Ponzi scheme.

Defendants-Appellants, Thomas D. McCloskey, Jr., Bonnie McCloskey, Cornerstone Holdings, LLC, and the McCloskey Trust ("Appellants") are alleged to be net winners, having received profits from the Ponzi scheme through their relationship with Essex. The Receiver filed a First Amended Complaint ("FAC") against Appellants, alleging fraudulent transfers from the receivership entities to Appellants and seeking avoidance and recovery of the fraudulent transfers pursuant to the California Uniform Fraudulent Transfer Act ("UFTA"), Cal. Civ. Code §§ 3439.04, 3439.07.

---

[2] The Receiver's March 27, 2023, motion for judicial notice is granted.

The FAC alleged that Cornerstone Holdings was the successor-in-interest to Cornerstone Essex Holdings, LLC ("CE Holdings") and that all of the Appellants received assets from the receivership entities. Relying on the SEC complaint, the FAC alleged that "Iannelli attracted investment into Essex through the sale of promissory notes, the returns on which were alleged to be based on the strength of Essex's equipment leasing business, pursuant to which Essex's lease portfolio would generate sufficient income to fully offset its borrowing costs and obligations to noteholder investors." However, "Essex's main source of funding was money that it received from investor-funded promissory notes and investor-funded LLCs, not income or revenue derived from its equipment leasing business." Based on a review of "more than 500,000 pages of materials," the Receiver "confirmed that Essex's payments of so-called returns on investments to investors, including [Appellants], . . . were funded by money obtained from new investors, consistent with the operations of a Ponzi scheme." The FAC alleged that Appellants were net winners, having received $1,240,906.35 more than they invested in the scheme. Because the receivership entities "operated a Ponzi investment scheme, and were insolvent, or became insolvent," shortly after transferring the payments to Appellants, the FAC sought the avoidance and recovery of the fraudulent transfers under the UFTA.

Appellants moved to compel arbitration. Appellants stated that their business relationship with Essex "was conducted through a jointly-owned and controlled entity," Cornerstone Essex Leasing LLC ("CE Leasing"). The members of CE Leasing were Essex and CE Holdings. Appellants explained that "Essex originated equipment leases," "CE Leasing paid for the equipment to be leased

using a combination of the capital investments of its members and a lending facility from Goldman Sachs," and Essex assigned the leases to CE Leasing. Appellants relied on arbitration agreements in two documents, the CE Leasing Operating Agreement and a Guaranty provided by Essex.

The CE Leasing Operating Agreement stated that it was an agreement between "the initial Members of Cornerstone Essex Leasing Co. LLC," and it contained an arbitration agreement, which stated that "[t]he Unitholders hereby submit all controversies, claims and matters of difference regarding this Agreement or the business and affairs of the Company to arbitration . . . in Broomfield, Colorado." Iannelli signed the Operating Agreement as President of Essex. The Manager who signed on behalf of CE Holdings was Neville Vere Nicoll.

In the Guaranty, Essex and Iannelli stated that, as Guarantors, they would "guaranty certain obligations" of CE Leasing, such as by "making payments to Goldman Sachs, to CE leasing or to CE Holdings." The Guaranty stated that "[t]he Guarantors hereby submit all controversies, claims and matters of difference regarding this Agreement or the business and affairs of the Company [CE Leasing] to arbitration . . . in Broomfield, Colorado." The Guaranty was signed by Iannelli individually and as President of Essex.

The district court denied Appellants' motion, relying on *EPD*, in which this court affirmed the bankruptcy court's denial of a motion to compel arbitration of the bankruptcy trustee's action to avoid fraudulent transfers by the debtors,

who ran a Ponzi scheme, to the defendants, who invested in the scheme.**³**

## STANDARD OF REVIEW

The denial of a motion to compel arbitration is reviewed de novo. *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023).

## DISCUSSION

The UFTA provides, in relevant part, that "[a] transfer made . . . by a debtor is voidable as to a creditor" if the transfer was made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1). The UFTA also allows a creditor to void a transfer if it was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and the debtor either "[w]as engaged . . . in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or "[i]ntended to incur . . . debts beyond the debtor's ability to pay as they became due." *Id.* § 3439.04(a)(2). "Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors." *Donell*, 533 F.3d at 767. The question is whether a receiver in an SEC enforcement action seeking to recover such monies is bound by an arbitration agreement signed by the receivership entity.

*EPD* addressed a similar question in the context of a bankruptcy proceeding. "Where state statutes are similar to

---

³ Appellants' motion, which the district court denied in its entirety, was to dismiss, stay, transfer venue, or lift the anti-suit injunction imposed by the receivership order so Appellants could file a petition for arbitration in Colorado.

the Bankruptcy Code, cases analyzing the Bankruptcy Code provisions are persuasive authority." *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 703 (9th Cir. 2008) (citing *Hayes v. Palm Seedlings Partners-A (In re Agric. Rsch. & Tech. Grp., Inc*.), 916 F.2d 528, 534 (9th Cir. 1990)). Because "California's fraudulent transfer statutes are similar in form and substance to the Bankruptcy Code's fraudulent transfer provisions," *EPD* does provide persuasive authority here. *Id.* (citing *Wyle v. C.H. Rider & Fam.* (*In re United Energy Corp.*), 944 F.2d 589, 594 (9th. Cir. 1991)); *see also Donell*, 533 F.3d at 769–70 ("California's fraudulent transfer act and the federal bankruptcy code's fraudulent transfer provisions are almost identical in form and substance; therefore, we draw upon cases interpreting both.") (collecting cases). However, differences between a receivership and bankruptcy require us to conclude that *EPD* does not control the result here.

In *EPD*, the debtors operated a Ponzi scheme in which the defendants invested. As pertinent here, the bankruptcy trustee for the debtors sought to avoid fraudulent transfers to the defendants under bankruptcy law and Cal. Civil Code § 3439.04. 821 F.3d at 1152. We rejected the defendants' argument that the fraudulent transfer claims were subject to arbitration clauses in their pre-petition agreements with the debtors. *Id.* *EPD* stated that, under the provision of the bankruptcy code at issue, "the Trustee is empowered only to bring claims that might be brought 'by a creditor holding an unsecured claim.'" *Id.* (quoting 11 U.S.C. § 544(b)(1)). The court further explained that "California Civil Code section 3439.04(a)(1) permits a *creditor* to bring a claim for fraudulent transfer that a debtor made with intent to hinder, delay, or defraud a creditor of the debtor," and that "for the purpose of these [fraudulent transfer] claims, the Trustee

stands in the shoes of the creditors, not the debtors." *Id.* Because the creditors did not sign the arbitration agreements, the agreements did not apply to the fraudulent transfer claims. *Id.*

We conclude that *EPD* does not control because a bankruptcy trustee's standing differs from a receiver's. 11 U.S.C. § 544 explicitly authorizes a bankruptcy trustee to act on behalf of creditors to avoid a transfer of property by the debtor.[4] *Cf. Allegaert v. Perot*, 548 F.2d 432, 436 (2d Cir. 1977) (concluding that claims under the Bankruptcy Act alleging "fraudulent, preferential or post-bankruptcy transfers" were not subject to arbitration because they "are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors, whose rights the trustee enforces"). By contrast, a receiver's authority derives from the court's equitable power. *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (stating that "[t]he federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws," and the district court's inherent power includes the power to impose a receivership); *see also* Keith Miller, 8 Business & Commercial Litigation Federal Courts § 92:49 (Robert L. Haig, ed., 5th ed. 2022) ("Because the SEC requests receivers under the court's equitable authority, SEC receiverships are by definition equitable receiverships, meaning that the receiver's powers and duties are set out by the order that grants his appointment and are

---

[4] The statute provides, in part, that the bankruptcy trustee "shall have . . . the rights and powers of, or may avoid any transfer of property of the debtor . . . that is voidable by" a creditor, and "may avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(a), (b)(1).

unique to the facts and circumstances of each case."). Unlike under bankruptcy law, there is no explicit statutory authorization here establishing that the receiver is acting on behalf of the receivership entity's creditors.

The Receiver contends that the reasoning of *EPD* applies to receiverships. He relies on *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), and *Donell*, 533 F.3d 762, to argue that although a receiver generally stands in the shoes of the receivership entity, the receiver actually is acting on behalf of the entity's creditors, when it brings fraudulent transfer claims.

In *Scholes*, the SEC brought suit against the mastermind of a Ponzi scheme and the three corporations through which he perpetrated the scheme. 56 F.3d at 752. The district court appointed a receiver, who sought to recover assets from investors as fraudulent conveyances. *Id.* at 752–53. The Seventh Circuit first addressed the defendant investors' argument that the receiver lacked standing to pursue the fraudulent transfer claims because the receiver was acting on behalf of the investors, and "a receiver does not have standing to sue on behalf of the creditors of the entity in receivership"; rather he may sue only on behalf of the receivership entity. *Id.* at 753.

*Scholes* held that the receiver had standing to sue the investors for fraudulent transfers. *Id.* at 755. The court acknowledged that "the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors," and that the corporations through which the Ponzi scheme operated were bound by this rule while they were controlled by the mastermind of the scheme. *Id.* at 754. However, the corporations were "separate legal entities" from the

mastermind, and once "[t]he appointment of the receiver removed the wrongdoer from the scene," the corporations were no longer the wrongdoer's "evil zombies." *Id.* The corporations thus became entitled to the return of money for the benefit of innocent investors. *Id.* The court concluded, "[n]ow that the corporations created and initially controlled by [the wrongdoer] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors," there could be no "objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [the wrongdoer]." *Id.* at 755; *accord Klein v. Cornelius*, 786 F.3d 1310, 1316–17 (10th Cir. 2015) (concluding that a receiver had standing under state UFTA to recover funds illegally distributed from a business through a Ponzi scheme because "[t]he UFTA provides rights and remedies for defrauded creditors," "a business entity abused by a Ponzi scheme qualifies as a defrauded creditor," and that business was injured when the perpetrator of the scheme "fraudulently transferred its funds"); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013) (holding that, although "a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors," the receiver had standing to proceed under the Texas UFTA to recover assets from Ponzi scheme investors because the court's appointment of the receiver freed the receivership entities from the "evil coercion" of the principal of the scheme).

In *Donell*, we addressed the use of the California UFTA in a suit brought by an SEC receiver to recover fraudulent transfers from an investor in a Ponzi scheme who was a net winner. 533 F3d at 766. The court explained that, in an action by a receiver or bankruptcy trustee under the UFTA

to recover money lost in a Ponzi scheme, "[t]he Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.' . . . The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer." *Id.* at 767 (citations omitted). The court rejected the defendant's argument that the receiver lacked standing to bring the action, agreeing with *Scholes* that, "although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that [the receivership entity] suffered when its managers caused [the entity] to commit waste and fraud." *Id.* at 777. Thus, a receiver has standing to pursue a fraudulent transfer claim because the receiver is acting on behalf of the receivership entity, seeking to claw back transfers that the perpetrator of the scheme fraudulently made to the net winners.

The Receiver argues that a receiver ultimately is acting on behalf of defrauded investors. It is true that the Receiver's actions ultimately will benefit defrauded investors. *See Donell*, 533 F.3d at 770 (explaining that the "policy justification" for allowing payments to investors in Ponzi schemes who received more than the amounts they invested to be avoidable as fraudulent transfers "is ratable distribution of remaining assets among all the defrauded investors"); *Scholes*, 56 F.3d at 754 (stating that the receivership entities were "entitled to the return of the moneys" "for the benefit . . . of innocent investors"); *Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 920 (E.D. Mich. 2018) (concluding that the receiver's suit to recover funds from a Ponzi scheme was not barred because the receiver "ultimately seeks relief for innocent investors"); *cf. FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (per curiam) (explaining in an FDIC case that a bank receiver, "like a bankruptcy trustee and unlike a

normal successor in interest," becomes the successor "as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct"); *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (stating that "a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors") (collecting cases). Nonetheless, even if the Receiver's actions ultimately benefit the receivership entity's creditors, pursuant to *Donell*, the Receiver stands in the shoes of the receivership entities, not in the shoes of the creditors. 533 F.3d at 777.

We acknowledge that the holdings of *Scholes* and *Donell* rely on the legal fiction that the receivership entity is a separate entity from the receivership corporation through which the Ponzi scheme was operated. This fiction is necessary because, "[o]rdinarily, . . . a debtor does not have standing to avoid his own transactions." *Donell*, 533 F.3d at 776. Moreover, although *Donell* did not explicitly say so, a receiver's standing to bring a UFTA claim also relies on the notion that the receivership entity, now freed from the wrongdoer, is in essence a defrauded creditor. *See Klein*, 786 F.3d at 1317 (discussing *Scholes*' reasoning and concluding, "[i]n essence, the corporations were creditors themselves"); *Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014) (agreeing with the receiver that he had standing because he acted on behalf of entities used by the Ponzi schemers, which are considered defrauded creditors under the Texas UFTA). This fiction is necessary because "[t]he [California] UFTA permits defrauded *creditors* to reach property in the hands of a transferee." *Mejia v. Reed*, 74 P.3d 166, 169 (Cal. 2003) (emphasis added). Nonetheless, the

Receiver is acting on behalf of the receivership entities, not other defrauded creditors.

Our conclusion that the Receiver is acting on behalf of the receivership entities does not establish that the Receiver is bound by the arbitration agreements between Essex and CE Holdings. Appellants argue that the Receiver is bound by the agreements, citing the general rule that "'[a] receiver occupies no better position than that which was occupied by the person or party for whom he acts . . . and any defense good against the original party is good against the receiver.'" *O'Melveny & Myers*, 61 F.3d at 19 (quoting *Allen v. Ramsay*, 4 Cal. Rptr. 575, 583 (Ct. App. 1960)). *O'Melveny & Myers* further stated, however, that the general rule is "subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver." *Id.* (citing *Camerer v. Cal. Sav. & Comm. Bank*, 48 P.2d 39, 44–45 (Cal. 1935)). This is because,

> [w]hile a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall. This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors.

*Id.*

We further note that the district court did not address whether the fraudulent transfer claims arise out of the

arbitration agreements or are outside the scope of the agreements – that is, whether the clawback action is a controversy, claim, or matter of difference regarding the agreement between Essex and CE Holdings. Nor did the district court address whether Appellants are parties to the arbitration agreements.**[5]**

We disagree with Appellants' assertion at oral argument that we must send the matter to the arbitrator to decide these questions. As this court explained in *Johnson*, the judiciary's role is to determine the very two questions at issue here: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Johnson*, 57 F.4th at 680 (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). Although there is generally a presumption in favor of arbitration, "the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Id.* at 680–81 (quoting *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014)). "As the part[ies] seeking to compel arbitration, [Appellants] bear[] the burden of proving the existence [and applicability] of an agreement to arbitrate by a preponderance of the evidence." *Id.* at 681 (citing *Knutson v. Sirius XM Radio Inc.* 771 F3d 559, 565 (9th Cir. 2014)).

We conclude that the Receiver is acting on behalf of the receivership entities, not the other defrauded creditors. Essex signed the Operating Agreement and Guaranty, but this does not establish that the Receiver is bound by the

---

[5] The Receiver points out that the McCloskeys were not parties to the arbitration agreements, which were between CE Holdings and Essex. The Receiver further argues that Appellants denied the FAC's allegation that Cornerstone Holdings was the successor-in-interest to CE Holdings.

arbitration agreements. We remand for the district court to consider in the first instance whether Appellants have met their burden of establishing that the UFTA claims arise out of the agreements, that Appellants are parties to the agreements, and any other remaining arbitrability issues.

**REVERSED and REMANDED.**