**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: EPD INVESTMENT
COMPANY, LLC AND JERROLD S.
PRESSMAN,

*Debtor.*

POSHOW ANN KIRKLAND, as
Trustee of the Bright Conscience Trust
Dated September 9, 2009,

*Appellant*,

v.

JASON M. RUND, Chapter 7 Trustee,

*Appellee*.

No. 22-55944

D.C. No. 2:21-cv-
00848-DSF

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted October 18, 2023
Pasadena, California

Filed August 23, 2024

Before:  Richard R. Clifton and Gabriel P. Sanchez, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Sanchez;
Dissent by Judge Clifton

## SUMMARY[**]

### Bankruptcy

The panel affirmed the district court's order affirming a judgment of the bankruptcy court, and remanded for further proceedings, in a fraudulent transfer action in which a jury determined that debtor Jerrold S. Pressman operated his business, EPD Investment Co., LLC (EPD), as a Ponzi scheme.

EPD was forced into Chapter 7 bankruptcy by its creditors.  The Trustee, Jason M. Rund, filed an adversary proceeding against Poshow Ann Kirkland (Ann) and her husband, John Kirkland (John), seeking to avoid fraudulent transfers made by EPD to John, who had assigned his interest in EPD to the Bright Conscience Trust.

The Trustee argued that Ann did not have standing to pursue this appeal because she was not a party to John's jury trial.  Ann was not a party to John's trial because, over her

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

objection, the district court granted the Trustee's motion to bifurcate the trial of the fraudulent transfer claims against her and John. The panel held that Ann had standing to appeal in light of Ann's significant involvement in the case and her interest in the issues presented.

At trial, the district court instructed the jury that a Ponzi scheme is a financial fraud that "consists of transferring proceeds received from new investors to previous investors, thereby giving investors the impression that a legitimate profit-making opportunity exists, where in fact no such opportunity exists." The jury was also instructed on the long-standing Ponzi-scheme presumption, which recognizes that a debtor's actual intent to hinder, delay, or defraud its creditors may be inferred by the mere existence of a Ponzi scheme.

The panel rejected Ann's argument that the district court erred by failing to include a *mens rea* instruction that would have required the jury to find that Pressman knew he was operating a Ponzi scheme that would eventually collapse. The panel held that the proposed *mens rea* instruction was not required because, as the Ponzi scheme presumption reflects, fraudulent intent may be inferred by evidence of the existence of a Ponzi scheme established through objective criteria. Implicit in the jury's finding that EPD was a Ponzi scheme was its finding that Pressman harbored the intent to defraud his investors by operating a scheme that had no legitimate profit-making opportunity.

The panel also rejected Ann's argument that the district court erred by instructing the jury that lenders are investors for purposes of a Ponzi scheme because there is no question that lenders can be victims of a Ponzi scheme as a matter of law.

The panel held that the evidence at trial was more than sufficient to support the jury's Ponzi scheme finding, and that the district court did not err in its evidentiary rulings.

Dissenting, Judge Clifton concluded that the jury was not properly instructed on the legal elements of a Ponzi scheme because it was not informed that a Ponzi scheme promoter must harbor fraudulent intent. Under the facts of this case, a finding of intent to defraud was not inevitable and cannot be presumed.

## COUNSEL

Daniel J. Gonzalez (argued), Steven S. Fleischman, and Peder K. Batalden, Horvitz & Levy LLP, Burbank, California; Stephen E. Hyam, Hyam Law APC, Granada Hills, California; Lewis R. Landau, Law Office of L. Landau, Calabasas, California; for Defendant-Appellant.

Corey R. Weber (argued) and Steven T. Gubner I, BG Law LLP, Woodland Hills, California; Ryan F. Coy, Saul Ewing LLP, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

SANCHEZ, Circuit Judge:

In a fraudulent transfer action arising from a bankruptcy proceeding, a jury determined that debtor Jerrold S. Pressman operated his business, EPD Investment Co., LLC ("EPD"), as a Ponzi scheme. The jury was instructed that a Ponzi scheme is a financial fraud that "consists of transferring proceeds received from new investors to previous investors, thereby giving investors the impression that a legitimate profit-making opportunity exists, where in fact no such opportunity exists." The jury was also instructed on our long-standing Ponzi-scheme presumption, which recognizes that a debtor's actual intent to hinder, delay, or defraud its creditors may be inferred by the mere existence of a Ponzi scheme. The main question in this appeal is whether the district court erred by failing to include a *mens rea* instruction that would have required the jury to find that Pressman knew he was operating a Ponzi scheme that would eventually collapse.

We conclude that the proposed *mens rea* instruction was not required. As the Ponzi scheme presumption reflects, fraudulent intent may be inferred by evidence of the existence of a Ponzi scheme established through objective criteria. Implicit in the jury's finding that EPD was a Ponzi scheme was its finding that Pressman harbored the intent to defraud his investors by operating a scheme that had no legitimate profit-making opportunity. A trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail. Because the evidence at trial was more

than sufficient to support the jury's Ponzi scheme finding, and the district court did not err in its jury instructions or evidentiary rulings, we affirm the judgment below.

## I.

This appeal arises from a complicated and extensively-litigated bankruptcy proceeding that has spawned several appeals to our court. Appellant Poshow Ann Kirkland, as trustee for the Bright Conscience Trust ("BC Trust"), appeals the judgment entered following a jury determination that Pressman operated EPD as a Ponzi scheme.

In 2010, EPD was forced into Chapter 7 bankruptcy by its creditors. The Trustee, Jason M. Rund, filed an adversary proceeding against Ann and her husband, John Kirkland, seeking to avoid fraudulent transfers made by EPD to John, who had assigned his interest in EPD to the BC Trust.[1] Following a six-day trial of the Trustee's claims against John, the jury returned a verdict finding that EPD was a Ponzi scheme but that John had received payments from EPD in good faith and for reasonably equivalent value. Judgment was entered in John's favor.

Ann nevertheless appeals the judgment because the jury's adverse Ponzi scheme finding will have preclusive effect in the Trustee's forthcoming trial against Ann to disallow or equitably subordinate BC Trust's proofs of claim. We begin with a description of EPD's operations from 2003-2010, the period in which the jury found that EPD operated as a Ponzi scheme. We describe the evidence at trial in a light most favorable to the jury's verdict. *See*

---

[1] Consistent with the parties' briefing, we refer to Ann Kirkland as Ann, in her capacity as trustee of the BC Trust, and her husband John Kirkland as John. The BC Trust was created for the benefit of their children.

*Harper v. City of Los Angeles*, 533 F.3d 1010, 1016 (9th Cir. 2008).

## A.

Debtor Jerrold Pressman and his son, Keith Pressman, co-owned EPD.[2]   The Pressmans used EPD to borrow money from individuals in exchange for short-term, thirty-day promissory notes or demand notes.   These notes promised above-market, mostly double-digit annual interest rates.   EPD called its lenders "investors" and described its lenders' funds as "an investment, rather than a loan that required repayment."   Jerrold Pressman deposited funds from EPD's lenders into a single bank account that comingled investor funds with EPD's operating funds.   EPD would prepare and circulate periodic account statements reflecting the amount of money each investor lent EPD, including interest accrued in their accounts.

EPD offered a few services for its lenders.   EPD ran a bill-pay service in which EPD made payments on mortgages, credit card statements, and other recurring bills.   EPD also facilitated "equipment leases" in which investors loaned money to EPD to acquire an ownership interest in a piece of equipment, and EPD purported to make periodic lease payments to lenders.

Jerrold Pressman used EPD to loan money to himself, which he then used to personally invest in other businesses in which he held partial ownership interests, including ice rinks, night clubs, marketing companies, and a commercial

---

[2] Debtor Jerrold Pressman operated EPD Investment Company as a sole proprietorship beginning in the 1970s.   In June 2003, Pressman transferred assets from the sole proprietorship to EPD, which he then structured as a California limited liability company.

real estate development firm (the "related entities"). The Pressmans also used EPD to pay off their own credit cards, mortgage payments, car payments, and other personal expenses. Jerrold and his son paid themselves $6,848,000 from EPD's bank account over the seven-year period in question.

EPD was never profitable during this period. Between 2003 and 2010, EPD lost money each year and accrued a total net loss of $14.4 million in income. EPD's liabilities also significantly exceeded its assets every year, with negative net equity ranging from $3 million to $24.2 million. Most of the assets booked by EPD were promissory notes from Jerrold Pressman himself, which were secured against his assets. Pressman's assets, in turn, primarily consisted of his partial ownership interests in the related entities.

The evidence at trial established that Jerrold Pressman could not repay his loans to EPD. During the relevant period, Pressman was $48 million in debt, which he kept afloat through loans, notes, and lines of credit. Pressman admitted on cross-examination that virtually all of his assets, including his ownership interests in the related entities, were subject to security interests that substantially exceeded the real market value of his assets. Pressman also acknowledged that none of his ownership interests in the related entities had any saleable value because of the liens upon them and because he had no controlling stake in these investments.

EPD's business operations and assets could not sustain its growing obligations to its investors. EPD accordingly relied on an ever-growing supply of investor money to stay afloat. The Trustee's expert, a forensic accountant, testified that the only way the Pressmans could pay themselves millions of dollars and repay EPD's lenders was by

consistently shifting money from lenders to pay other lenders.

EPD collapsed in 2009. At the time of its bankruptcy filing, EPD had approximately $32 million in assets and approximately $70 million in liabilities. The $32 million listed as EPD's assets, however, consisted almost entirely of debt from Jerrold Pressman and his related entities. Pressman personally owed EPD $25 million, but he had no ability to repay EPD because he reported only $27,000 in assets against $144 million in personal liabilities.

Prior to EPD's collapse, John Kirkland made a series of loans to EPD between September 2007 and July 2009 totaling $2,055,000. John was an attorney admitted to practice law in California, and he periodically represented entities controlled or partially owned by Jerrold Pressman. In return, EPD made mortgage payments on John's behalf. John later assigned his credit interest in the EPD loans to the BC Trust, for which his wife Ann is the sole trustee. Ann filed secured claims seeking $3,529,000 from EPD's estate, which included interest on the loans John had assigned to the BC Trust.

## B.

In December 2010, certain lenders initiated involuntary bankruptcy proceedings against EPD. The bankruptcy court consolidated EPD's and Jerrold Pressman's bankruptcy estates and appointed Jason M. Rund as trustee. In October 2012, the Trustee sued John Kirkland individually and Ann Kirkland in her capacity as trustee of the BC Trust to claw back certain transfers of funds from EPD to the Kirklands executed ahead of bankruptcy.

The Trustee's complaint alleged in relevant part that (1) EPD operated as a Ponzi scheme and, in mid-2009, stopped making payments to all but a few favored creditors; (2) while acting as counsel for EPD and Pressman, John invested or lent at least $150,000 to EPD; (3) after EPD stopped making payments to creditors, John transferred his interests in EPD to his family trust (the BC Trust) and/or his wife as trustee; (4) the trust filed a financing statement against all assets of EPD and Pressman; (5) John knew about the Ponzi scheme and knew that filing the financing statement was a fraudulent conveyance; and (6) John arranged for Pressman, through EPD, to make John's monthly mortgage payments to his lender while John was aware of the Ponzi scheme. *See In re EPD Inv. Co., LLC*, 821 F.3d 1146, 1148 (9th Cir. 2016).[3]

Because John had not filed a claim in the bankruptcy proceeding or otherwise consented to the bankruptcy court's jurisdiction, John exercised his right to a jury trial before the district court. *See In re EPD Inv. Co.*, 594 B.R. 423, 426 (C.D. Cal. 2018) (citing *Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990) (per curiam)). In December 2018, the district court withdrew the reference of the adversary proceedings from the bankruptcy court. *Id.* In June 2019, the district court granted the Trustee's motion to bifurcate the trials of the (1) disallowance, equitable subordination, and fraudulent transfer claims against Ann and the BC Trust, and (2) the fraudulent transfer claims against John. The district court explained in its bifurcation order that the first phase

---

[3] Trial was delayed for several years pending the resolution of a motion to compel arbitration brought by John, which this Court ultimately denied in May 2016. *See In re EPD Inv. Co., LLC*, 821 F.3d 1146 (9th Cir. 2016).

would be a jury trial of the fraudulent transfer claims against John, after which the district court would determine whether to refer the case back to the bankruptcy court to resolve the core bankruptcy claims.

The district court conducted a six-day jury trial of the Trustee's claims against John. On July 3, 2019, the jury returned a verdict in favor of John. In reaching its verdict, the jury made the following findings:

(1)   EPD was a Ponzi scheme;

(2)   John was not an insider of EPD and/or Pressman;

(3)   EPD and/or Pressman transferred property to John to hinder, delay, and defraud one or more of their creditors; and

(4)   John received the transfers in good faith and at reasonably equivalent value.

Following the verdict, the district court referred the case back to the bankruptcy court. The bankruptcy court ruled that all explicit and implicit jury findings as to John would remain binding with respect to the Trustee's claims against the BC Trust. After some delay, the bankruptcy court entered a final judgment in favor of John on all claims against him. Ann appealed from the judgment, seeking vacatur of the jury finding that EPD was a Ponzi scheme. The district court affirmed the judgment. This timely appeal followed. We have jurisdiction under 28 U.S.C. § 158(d)(1).

## II.

Before we address Ann's contentions on appeal, we must first determine if she has standing to challenge the jury's Ponzi scheme finding in the Trustee's action against John. The Trustee argues that Ann does not have standing to pursue this appeal because she was not a party to John's jury trial. Ann did not participate in the jury trial because, over her objection, the district court granted the Trustee's motion to bifurcate the trial of the fraudulent transfer claims against her and John. Following the jury verdict for John, however, the bankruptcy court held that all findings from the trial—including the finding that EPD was a Ponzi scheme—would be binding with respect to the Trustee's claims against the BC Trust. Ann now seeks to appeal the Ponzi scheme finding. We conclude that she has standing to do so.[4]

We allow nonparties to appeal when (1) the appellant, though not a party, was "significantly involved in the district court proceedings," and (2) the equities of the case weigh in favor of hearing the appeal. *United States ex rel. Alexander Volkhoff, LLC v. Janssen Pharmaceutica N.V.*, 945 F.3d 1237, 1241–42 (9th Cir. 2020). Both elements are satisfied here.

---

[4] Both parties proceed under the assumption that Ann is necessarily a nonparty for purposes of this appeal because she was not a party to the bifurcated jury trial involving her husband. That assumption is debatable. Ann's trial was bifurcated, but she was always (and remains) a party to the adversarial action because she was never severed from the lawsuit. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2387 (3d ed. 2023) (distinguishing a motion for separate trials (or bifurcation) from a motion for severance). We need not address the impact of bifurcation on party status because Ann has standing to appeal even as a nonparty.

Even if the district court's bifurcation of the fraudulent transfer trial rendered Ann a nonparty to that trial, she was "significantly involved" in the proceedings below.  Ann is a named party in the Trustee's ongoing adversary action against the BC Trust, she testified as a witness in John's trial below, and she is subject to the consequences of the jury's adverse Ponzi scheme finding.  The equities also weigh in favor of hearing Ann's appeal because the Trustee has indicated he intends to use the Ponzi scheme finding against Ann at her upcoming trial which, according to Ann, would "bar her recovery of millions of dollars in interest on the loans John had assigned to the BC Trust."  In light of Ann's significant involvement in the case and her interest in the issues presented, we conclude she has standing to appeal.

## III.

Ann challenges the district court's jury instruction defining a Ponzi scheme on two grounds.  She contends the district court erroneously instructed the jury by failing to include a *mens rea* element as part of the definition of a Ponzi scheme and by instructing the jury that lenders are investors for purposes of a Ponzi scheme.  We address each contention in turn.

## A.

A Ponzi scheme is a financial fraud that induces investment by promising high returns, usually in a short time period, where in fact no legitimate profit-making business opportunity exists.  *See Winkler v. McCloskey*, 83 F.4th 720, 723 n.1 (9th Cir. 2023).  We have characterized these schemes as "borrow[ing] from Peter to pay Paul" because the fraud consists of funneling money from new investors to pay old investors while cultivating the illusion of a legitimate profit-making business.  *See United States v.*

*Rasheed*, 663 F.2d 843, 849 n.1 (9th Cir. 1981) (citation and internal quotation marks omitted).

By definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, *Expanding the Ponzi Scheme Presumption*, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704.

Trustees of a Ponzi scheme estate often rely on the fraudulent transfer provisions of the Bankruptcy Code or state fraudulent transfer laws to recover funds lost by Ponzi scheme investors. *See Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008); *see also* Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr. L.J. 157, 158 (1998). Fraudulent conveyance suits, often called "clawback" actions, seek to recover the false returns received by winning investors so that the excess proceeds can be redistributed to losing investors.[5] *See Winkler*, 83 F.4th at 723 n.1 (citation and

---

[5] There are three main sources of fraudulent transfer law: (1) section 548 of the Bankruptcy Code, (2) the Uniform Fraudulent Conveyance Act (UFCA), and (3) the Uniform Fraudulent Transfer Act (UFTA). *See* McDermott, *supra*, at 159. Almost every state has enacted either the UFCA or the UFTA, and there are few substantive distinctions between the two uniform statutes or between the two statutes and section 548 of

internal quotation marks omitted).  Where causes of action are brought against Ponzi scheme investors, "the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." *Donell,* 533 F.3d at 770 (cleaned up).

Bankruptcy Code section 548 authorizes a trustee to avoid any transfer of funds made by a debtor with (a) an "actual intent to hinder, delay, or defraud" creditors; or (b) for less than a "reasonably equivalent value," among other criteria.  11 U.S.C. § 548(a)(1)(A)-(B)(i); *see also Henry v. Lehman Commercial Paper, Inc. (In re First All. Mortg. Co.)*, 471 F.3d 977, 1008 (9th Cir. 2006).  In a clawback suit against a winning investor in a Ponzi scheme, the trustee may pursue two distinct theories of recovery: constructive fraud or actual fraud.  *Donell*, 533 F.3d at 770. As relevant here, a trustee pursuing recovery under a theory of actual fraud must show that the debtor (Ponzi scheme operator) transferred funds to the transferee (the winning investor) "with actual intent to hinder, delay, or defraud" the creditors (the losing investors).  *Id.* (cleaned up); *see also* 11 U.S.C. § 548 (a)(1)(A).  If the trustee proves that the debtor operated a Ponzi scheme, the trustee is entitled to the irrebuttable presumption that the debtor transferred money with actual fraudulent intent under section 548.  Or, as we

---

the Bankruptcy Code.  *See id.* at 160.  The Bankruptcy Code expressly authorizes a trustee to bring suit under the terms of both section 548 and applicable state law, including the UFTA or the UFCA.  *See* 11 U.S.C. § 544(b).  Our fraudulent conveyance caselaw accordingly draws on cases interpreting all three sources.  *See, e.g.*, *Donell*, 533 F.3d at 769–70; *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 593–94 (9th Cir. 1991); *In re Agric. Rsch. & Tech. Grp., Inc. (In re AgriTech)*, 916 F.2d 528, 534 (9th Cir. 1990).

have repeatedly put it, "[t]he mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell*, 533 F.3d at 770 (quoting *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008)).

Once a trustee proves that the debtor operated a Ponzi scheme and therefore establishes an actual intent to defraud, the burden shifts to the winning investor to show they received the subject transfers in "good faith" and for "reasonably equivalent value." *See id.* at 771; *see also* 11 U.S.C. § 548(c). An innocent investor who establishes a good faith defense may retain their own investment but must return any amounts in excess of their investment so that the recovered funds may benefit the estate and other victims of the fraud. *See Donell*, 533 F.3d at 770; *see also Winkler*, 83 F.4th at 723 n.1; Hague, *supra*, at 886.

**B.**

At trial, the district court instructed the jury that, "[f]or the purposes of proving a fraudulent transfer, EPD and Pressman's actual intent to hinder, delay, or defraud creditors is established if Plaintiff proves that EPD operated as a Ponzi scheme." Although the Bankruptcy Code contains no provision specifically directed at Ponzi schemes, this Court has long recognized a presumption under which a debtor's actual intent to hinder, delay or defraud its creditors "may be inferred from the mere existence of a Ponzi scheme." *In re AgriTech*, 916 F.2d at 535. This is called the Ponzi scheme presumption.

At issue in this appeal is the district court's following definition of a Ponzi scheme:

> A Ponzi scheme is a financial fraud that
> induces investment - often by promising

high, risk-free returns within a relatively short time period. In a Ponzi scheme, payments are made to investors or lenders from later investments or loans rather than from profits of the underlying business venture. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists. Distributing funds to earlier investors from the receipt of monies from later investors or lenders is the hallmark of Ponzi schemes.

The mere fact that a company has negative cash flows for several years is not alone sufficient to conclude that a company is a Ponzi scheme.

The district court's jury instruction tracks, almost verbatim, how this Circuit has defined a Ponzi scheme for over thirty years. *See, e.g.*, *In re United Energy Corp.*, 944 F.2d at 590; *In re AgriTech*, 916 F.2d at 536; *Donell*, 533 F.3d at 767 n.2; *Winkler*, 83 F.4th at 723 n.1.

Ann challenges the district court's Ponzi scheme instruction on two grounds. She contends the instruction was erroneous because it omitted a *mens rea* or fraudulent intent requirement. She argues further that the district court erroneously treated lenders as "investors" in its definition of a Ponzi scheme, even though EPD's lenders were entitled only to interest, with no right to share in Pressman's profits. We review de novo whether the district court's jury instructions accurately stated the law. *See Coston v.*

*Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) (citation omitted).

At trial, John proposed an instruction defining a Ponzi scheme with an express *mens rea* element. The proposed instruction would have required the jury to find that the alleged "perpetrator of a Ponzi scheme"—in this case Jerrold Pressman—"must know that the scheme will eventually collapse as a result of the inability to attract new investors." The district court disagreed and gave the instruction provided above. Ann renews John's challenge on appeal and argues that the Trustee was required to show not only that EPD operated as a Ponzi scheme but also that Jerrold Pressman *knew* that the Ponzi scheme he was operating would eventually collapse.

We disagree. As we explain below, the jury found that Pressman operated an entity that meets the objective criteria of a Ponzi scheme. Implicit in the jury's finding that EPD was a Ponzi scheme was its finding that Pressman harbored the intent to defraud his investors by operating a scheme that had no legitimate profit-making opportunity. The jury therefore properly presumed Pressman's actual intent to defraud his creditors.

This Circuit's definition of a Ponzi scheme recognizes two essential elements: (1) the funneling of money from new investors to pay old investors, and (2) no legitimate profit-making business opportunity exists for investors. *See Winkler*, 83 F.4th at 723 n.1 (quoting *Donell*, 533 F.3d at 767 n.2). Both are objective factors. While we have not further delineated the precise elements trustees must prove before

courts may apply the Ponzi scheme presumption,[6] courts and legal scholars who have done so rely exclusively on objective criteria. Some use a four-factor test that considers whether (1) deposits were made by investors; (2) the debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operation of the debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.[7] Others have identified badges that weigh in favor of finding a Ponzi scheme, including (1) the absence of any legitimate business connected to the investment program; (2) the unrealistic

---

[6] That is because when we have previously addressed the Ponzi scheme presumption, the existence of the underlying Ponzi scheme was not seriously disputed. *See, e.g.*, *Donell*, 533 F.3d at 773 ("There was no triable issue of fact that Wallenbrock was a Ponzi scheme"); *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1218 n.8 (9th Cir. 1988) (asserting without further discussion that "[t]he record indicates that BRNA was conducting . . . a [Ponzi] scheme"); *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 809 (9th Cir. 2008) (Slatkin admitted in a plea agreement that he operated a Ponzi scheme from 1986 to May 2001); *but see In re AgriTech*, 916 F.2d at 536–38, 542 (parsing to some extent the circumstantial evidence suggestive of a Ponzi scheme despite a "Plea Agreement demonstrat[ing] . . . the existence of a Ponzi scheme at least as early as 1982").

[7] *See, e.g.*, *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, No. 08-15051, 2014 WL 47774, at *9 (S.D.N.Y. 2014); *Armstrong v. Collins*, Nos. 01 Civ. 2437, 02 Civ. 2796, 3620, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010); *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006); *Carney v. Lopez*, 933 F. Supp. 2d 365, 379 (D. Conn. 2013); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Kapila v. TD Bank, N.A.* (*In re Pearlman*), 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).

promises of low risk and high returns; (3) commingling investor money; (4) the use of agents and brokers paid high commissions to perpetuate the scheme; (5) misuse of investor funds; (6) the payment of excessively large fees to the perpetrator; and (7) the use of false financial statements. *See* Hague, *supra*, at 868. Each approach requires the factfinder to assess whether a Ponzi scheme exists by examining the objective characteristics of the scheme itself.

Here, the district court instructed the jury that EPD was a Ponzi scheme if Pressman was, in fact, "pay[ing] investors or lenders from later investments or loans rather than from profits of the underlying business venture . . . thereby giving other investors the impression that a legitimate profit-making business opportunity exists where in fact no such opportunity exist[ed]." The district court's instruction, considered as a whole, contained the essential elements of a Ponzi scheme: consistent funneling of money from new investors to pay old investors where in fact no legitimate profit-making business opportunity exists. *See Winkler*, 83 F.4th at 723 n.1 (quoting *Donell*, 533 F.3d at 767 n. 2). If those objective elements were present, as the jury found, then the jury could reasonably infer Pressman's fraudulent intent because he *must* have known that his pyramid scheme would end at some point. In fact, "no other reasonable inference is possible." *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987) (en banc).

Both Ann and the dissenting opinion disagree and find these objective criteria insufficient to establish Pressman's fraudulent intent. Ann advocates for a rule under which trustees seeking to avoid fraudulent transfers must prove not only that the debtor was operating a Ponzi scheme through

objective criteria, but also that the debtor subjectively knew their Ponzi scheme would eventually fail. Our dissenting colleague contends that the jury should have been instructed to find that the Ponzi scheme operator acted with actual intent to defraud.

We are unaware of any court decision that has adopted an express *mens rea* requirement when defining a Ponzi scheme in a civil or bankruptcy action to avoid a fraudulent conveyance, and for good reason. The basis for applying the Ponzi scheme presumption in the first place is that a Ponzi scheme is doomed to fail by virtue of its pyramid structure. Because a pyramid scheme relies on an impossibility—a limitless pool of new investors—a Ponzi scheme operator "must know all along, *from the very nature of his activities*, that investors at the end of the line will lose their money." *In re Indep. Clearing House Co.*, 77 B.R. at 860 (emphasis added). As our sister circuits have explained, "[s]ince Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment." *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (observing that Ponzi schemes are insolvent from their inception as a matter of law). So if the essential elements of a Ponzi scheme are truly present— consistent funneling of money from new investors to pay old investors where in fact no legitimate profit-making business opportunity exists—then the operator's actual intent to defraud his investors and knowledge that the scheme will eventually fail follows logically and necessarily.

As a practical matter, Ann's proposed *mens rea* instruction could prove unworkable. The purpose of a fraudulent conveyance action is to allow trustees to recover

assets or funds from profiting Ponzi scheme investors to equitably redistribute and minimize the losses suffered by losing Ponzi scheme investors. *See Donell*, 533 F.3d at 769. Objective criteria permit a factfinder to determine from the evidence whether the entity fosters legitimate profit-making opportunities or instead exists as a fraudulent scheme to funnel investments from new investors to old. Trustees are unlikely to find direct evidence of the operator's subjective intent to operate a Ponzi scheme because, as one bankruptcy court noted, it is "highly unusual" to "have a confession of guilt with respect to the fraudulent nature of the transactions as well as the actual fraudulent intent of the perpetrator." *Kasolas v. Nicholson (In re Fox Ortega Enter., Inc.)*, 631 B.R. 425, 443 (Bankr. N.D. Cal. 2021).

We are satisfied that the district court's jury instruction contained the essential elements to find that a Ponzi scheme existed. Because the jury found that Pressman operated an entity that meets the objective criteria of a Ponzi scheme, it properly presumed his actual intent to defraud his creditors. No further *mens rea* instruction was required as a matter of law.

Ann's second argument fares no better. She challenges the district court's inclusion of "lenders" as a class of potential victims of a Ponzi scheme. The court's jury instruction stated that "[i]n a Ponzi scheme, payments are made to investors *or lenders* from later investments *or loans* rather than from profits of the underlying business venture." Ann argues that only "investors" can fall victim to a Ponzi scheme because only they have a particular expectation concerning the use of their funds, since the success of their investment depends on the business generating a profit. Lenders, her theory goes, cannot be victims of a Ponzi

scheme because they are entitled to be repaid regardless of how the borrower performs.

There is no question that lenders can be victims of a Ponzi scheme as a matter of law. Many Ponzi schemes rely on loans and short-term promissory notes as opposed to equity investments—including Charles Ponzi's eponymous scheme itself. *See Cunningham v. Brown*, 265 U.S. 1, 7 (1924). Ann concedes this point but argues that EPD's lenders, specifically, were not investors because Pressman offered them commercially reasonable interest rates. But this argument raises a *factual* dispute about the sufficiency of the evidence, rather than a legal challenge to the jury instruction itself.[8] At bottom, Ann provides no basis to hold that the district court misstated the law by including lenders as a possible class of victims of a Ponzi scheme. *See Coston*, 13 F.4th at 732. We find no legal error in the district court's jury instructions defining a Ponzi scheme.

## IV.

Ann next argues that the evidence at trial was insufficient to support the jury's Ponzi scheme finding.[9] We must

---

[8] Her argument is also unpersuasive. A reasonable lender, no less than an equity investor, would have understood that the above-market returns (as high as 12%) that Pressman consistently promised them were investments because they were subject to risk and depended in part on the success of the particular profit-making enterprise Pressman claimed to operate. Moreover, as the Trustee notes, EPD's own controller testified that EPD called its lenders "investors," and EPD filed a general denial in state court asserting that its lenders' funds "were an investment, rather than a loan that required repayment."

[9] The Trustee contends that Ann waived her right to challenge the sufficiency of the jury's Ponzi scheme finding on appeal because she

uphold the jury's verdict so long as it is supported by "substantial evidence." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1046–47 (9th Cir. 2018) (citation and internal quotation marks omitted). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Id.* (citation omitted). We may overturn the jury's verdict when the "evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

Substantial evidence supports the jury's finding that the Pressmans operated EPD as a Ponzi scheme between 2003 and 2010. The jury heard evidence that EPD consistently funneled money between its lenders. The Trustee's forensic accounting expert, Thomas Jeremiassen, reconstructed EPD's books and records to assess EPD's sources and uses of cash between 2003 and 2010. He testified that the only way the Pressmans could pay themselves millions of dollars over the relevant period and provide above-market returns to EPD's lenders was by using money from lenders to pay other lenders. Jeremiassen further testified that EPD funneled money between lenders "for the whole period of time."

---

failed to file a post-trial motion, as required by Federal Rule of Civil Procedure 50(b). It is true that the failure to file a post-verdict motion for judgment as a matter of law generally precludes appellate review of the sufficiency of the evidence to support the verdict. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). But again, this case is procedurally distinct because the first phase of the bifurcated jury trial only addressed claims involving fraudulent transfers to John Kirkland. It is unclear whether Ann had the opportunity to file a Rule 50(a) or 50(b) motion in the trial below. In light of the unusual posture of this case, we decline to rule that Ann waived her right to challenge the sufficiency of the evidence on appeal.

John's rebuttal expert, J. Michael Issa, conceded that EPD used investors' money to pay other investors. As we have long held, "[d]istributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes." *In re AgriTech*, 916 F.2d at 536.

A reasonable juror could also conclude from the evidence that Pressman managed EPD by funneling money between investors to disguise the absence of a legitimate profit-making business opportunity. The Trustee presented evidence that EPD was never profitable during the relevant time period. EPD lost money each year between 2003 and 2010, sustaining a total net loss of over $14 million. EPD's liabilities significantly exceeded its assets, with negative net equity ranging each year from $3 million to $24.2 million. Most of the assets booked by EPD were promissory notes from Jerrold Pressman himself, which were secured against his assets. But as the district court noted in its opinion affirming the judgment of the bankruptcy court, there was little to no evidence that EPD's debtors had the ability to pay back the loans.

As for Pressman himself, the jury heard evidence that during the relevant period he was $48 million in debt, which he kept afloat through loans, notes, and lines of credit. The jury heard Pressman admit that his partial ownership interests in the related entities had no saleable value. These interests were subject to liens that substantially exceeded the real market value of the assets, and he had no ability to sell them or convert them to cash. In short, Pressman had no ability to pay back his loans to EPD.

The Trustee introduced other circumstantial evidence that EPD was not a legitimate profit-making venture. The jury heard evidence that Pressman commingled the funds he

received from investors and then used those funds, in part, to enrich himself and his family. The Pressmans withdrew $6,848,000 from EPD's bank account to benefit themselves during the same period in which EPD lost over $14 million. This behavior is common in Ponzi schemes. *See, e.g.*, *In re Ramirez Rodriguez*, 209 B.R. at 429 (Ponzi scheme operator commingled investor funds and used them to pay earlier investors, operating expenses, and personal expenses); *In re Taubman*, 160 B.R. 964, 972 (Bankr. S.D. Ohio 1993) (same).

Ponzi scheme perpetrators often provide false or misleading financial information to their victims. Bernie Madoff, for example, sent his victims account statements with fabricated returns when, in actuality, his investment firm was making few, if any, trades. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 179 (2d Cir. 2021).[10] Here, EPD's controller testified that although its lenders received regular account statements from EPD showing amounts invested, accrued interest, and withdrawals, the amounts listed on the account statements were not actually held by EPD. The Trustee also adduced evidence that although EPD purported to facilitate "equipment leases," EPD's financial statements and records did not reflect that any such leases ever existed. Considered as a whole, and viewed in a light most favorable to the Trustee, the record contains substantial evidence to support the jury's finding that EPD did not present a legitimate business opportunity

---

[10] *See also In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007) (Ponzi scheme operator sent account statements to current investors that reflected significant gains, concealed the fund's true state from its auditors, and used his falsified records to attract new investors).

and instead operated as a Ponzi scheme.  *See Harper*, 533 F.3d at 1016.

Ann disagrees.  She claims the record compels a finding that EPD offered its lenders a legitimate profit-making opportunity because the jury heard evidence that Pressman used EPD to finance at least some legitimate businesses, including ice rinks, night clubs, marketing companies, and commercial real estate development.  She contends that EPD therefore could not have been a Ponzi scheme as a matter of law.  Ann is mistaken.

The presence of legitimate investments or assets does not necessarily negate the existence of a Ponzi scheme as a matter of law.  In *In re Slatkin*, for example, we explained that the mere fact that a Ponzi scheme operator reported income to the Internal Revenue Service and achieved capital gains for some of his investors was "not inconsistent with his operation of a massive Ponzi scheme."  525 F.3d at 816; *see also Donell*, 533 F.3d at 767–68 (Ponzi scheme operator took investor money and used some of it to pay off earlier investors, some to pay for personal expenses, and some to invest in risky start-up companies).  Our sister circuits have made the same point.  *See, e.g.*, *United States v. Murray*, 648 F.3d 251, 256 (5th Cir. 2011) (the "existence of assets" does not prevent a conspiracy from amounting to a Ponzi scheme).[11]  Ultimately, determining whether a debtor who made some legitimate investments nevertheless operated a

---

[11] *See also Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir. 1996) (Ponzi scheme existed in partnership hedge fund where trading resulted in net profits in a few years, though in most years the operation realized net trading losses); *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1332 (10th Cir. 1996) (Ponzi scheme existed where its perpetrator used the company's legitimate operations as a computer sales and leasing company as a front).

Ponzi scheme calls for a case-specific and fact-intensive inquiry.

Here, we are satisfied that the jury undertook that inquiry and concluded that Pressman managed EPD by funneling money between investors to disguise that a legitimate profit-making business opportunity did not exist. While Ann offers a plausible different reading of the record, we review a jury's verdict "for substantial evidence, not for whether the evidence could have supported a different verdict." *Baker v. Hazelwood (In re Exxon Valdez)*, 270 F.3d 1215, 1237 (9th Cir. 2001). Because the record contains substantial evidence to support the jury's finding, we deny Ann's challenge and uphold the jury's verdict.

## V.

Finally, Ann contends that the district court wrongly admitted testimony and demonstrative charts by the Trustee's expert witness. At trial, the Trustee's expert witness, Jeremiassen, deployed a series of demonstrative charts as he opined that EPD was a Ponzi scheme. Jeremiassen explained that his opinion was based on a review of EPD's bank and internal financial records for the period of December 2003 through December 2010, as summarized in the charts. Ann now asks us to vacate the jury's finding of a Ponzi scheme because the district court committed prejudicial evidentiary error in overruling the defense's objections under Federal Rule of Evidence 703 and in declining to give a limiting instruction to the jury regarding Jeremiassen's expert testimony.[12]

---

[12] While Ann argues on appeal that Jeremiassen's charts were also "inadmissible hearsay," we agree with the Trustee that her hearsay

We review evidentiary rulings for abuse of discretion and uphold the district court's determination if it "falls within a broad range of permissible conclusions." *Grant v. City of Long Beach*, 315 F.3d 1081, 1091 (9th Cir. 2002), *opinion amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003). We find no abuse of discretion in the district court's Rule 703 ruling.

Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. By its plain text, Rule 703 limits when *inadmissible* facts or data that underpin an expert's opinion may be disclosed to the jury.

As the district court noted, the flaw in Ann's Rule 703 challenge is that the financial statements underlying

---

challenge was not preserved. *See United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) ("[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making the *wrong* specific objection." (citations omitted)).

Jeremiassen's charts and opinion were admissible business records and were, in fact, admitted. Jeremiassen testified that his opinion was based on EPD's bank records—including "[b]ank statements, statements of account, monthly statements of account, copies of checks, canceled checks, deposit details, [and] wire transfers"—as well as EPD's internal financial records, including accounting records, investor files, and tax returns. Rule 703 thus did not bar the publication and admission of Jeremiassen's charts and testimony, respectively.

The heart of Ann's contention on appeal is her view that the financial statements actually admitted into evidence could not support Jeremiassen's substantive opinions regarding the sources and recipients of cash that went into and out of EPD's bank account. But the proper vehicle for challenging Jeremiassen's methodology—i.e., the reliability of his opinion—would have been a *Daubert* motion or, absent that, vigorous attack by cross examination and contrary evidence at trial. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Opinion based on unsubstantiated and undocumented information is the antithesis of scientifically reliable expert opinion." (alterations adopted) (citation and internal quotation marks omitted)); *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."), *as amended* (Apr. 27, 2010). Finding no abuse of discretion, we decline to vacate the jury's finding of a Ponzi scheme on grounds of prejudicial evidentiary and instructional error.

## CONCLUSION

We affirm the district court's order affirming the judgment of the bankruptcy court and remand the case for further proceedings.

---

CLIFTON, Circuit Judge, dissenting:

The majority opinion is based upon a jury finding that EPD Investment Co., LLC, the business operated by Jerrold S. Pressman, was a "Ponzi scheme." A Ponzi scheme is unlawful because it is a form of fraud. A finding of fraud requires a finding that the promoter of the scheme acted with actual intent to defraud. The majority opinion concludes that this intent requirement was satisfied because the jury found that Pressman's enterprise operated as "a Ponzi scheme." That leads the majority opinion to affirm the judgment of the bankruptcy court.

But that circular reasoning misses an essential element of fraud. The jury was never instructed that to find that the enterprise was a Ponzi scheme the jury had to find that Pressman acted with an intent to defraud. Because no such intent finding was ever made by the jury, the jury's Ponzi scheme finding cannot stand to be applied in the current proceeding. Under the facts of this case, a finding of intent to defraud was not inevitable and cannot be presumed. The judgment of the bankruptcy court should be vacated and the case remanded for further proceedings. I respectfully dissent from the conclusion to the contrary.

To begin, I agree with the majority opinion that Poshow Ann Kirkland (Ann), as trustee of the Bright Conscience Trust, has standing to challenge the jury's affirmative Ponzi

scheme finding rendered in the Trustee's action against John Kirkland (John). I also agree that there were no evidentiary errors during the trial that require us to set aside the jury verdict.

Where I diverge sharply from the majority opinion, and therefore dissent, is that I conclude that the jury was not properly instructed on the legal elements of a Ponzi scheme where it was not informed that a Ponzi scheme promoter must harbor fraudulent intent.

A Ponzi scheme is unlawful because it is a type of fraud, *see, e.g.*, *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991), but whatever someone might describe as a "Ponzi scheme" is not itself established as unlawful. Indeed, the relevant federal and California statutes do not contain provisions specifically prohibiting "Ponzi schemes." Rather, the conduct underlying a "Ponzi scheme" runs afoul of prohibitions regarding fraud. The term "Ponzi scheme" is merely a common lay term used to describe one form of unlawful fraud.

Although this court has often described Ponzi schemes as "fraudulent arrangement[s]," *see, e.g.*, *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988), we have never delineated the precise legal elements that a jury must find to establish the existence of a Ponzi scheme, as the majority opinion acknowledges, at 18-19.[1] Even describing Ponzi schemes as "fraudulent

---

[1] This is so, because when we have addressed Ponzi schemes in the bankruptcy context in the past, the existence of a Ponzi scheme was undisputed, as the majority opinion notes at 19 n.6. Accordingly, this

arrangements" sheds minimal light on the necessary legal elements as there are multiple types of fraud.

"Actual fraud" requires showing wrongful intent. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). The bankruptcy Trustee in this case seeks to claw back various transfers of funds from EPD to the Kirklands under the "actual fraud" provision of the Bankruptcy Code's fraudulent transfer section. This provision authorizes trustees to avoid transfers of funds made by a debtor with an "actual intent to hinder, delay, or defraud" creditors. Thus, the plain language of § 548(a)(1)(A) makes clear that the fraud at issue here – "actual fraud" – requires wrongful intent, or *mens rea*. *See* 11 U.S.C. § 548(a)(1)(A); *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 371 (2018); *Husky*, 578 U.S. at 360.

Courts have recognized that it is "highly unusual . . . to have a confession of guilt with respect to the fraudulent nature of [a] transaction[] as well as the actual fraudulent intent of the perpetrator." *Kasolas v. Nicholson (In re Fox Ortega Enter., Inc.)*, 631 B.R. 425, 443 (Bankr. N.D. Cal. 2021). Accordingly, a presumption has developed – referred to as the "Ponzi scheme presumption" – under which a "debtor's actual intent to hinder, delay or defraud its creditors" for purposes of § 548(a)(1)(A) "may be inferred from the mere existence of a Ponzi scheme." *In re Agric.*

---

court has not had reason or occasion to parse jury instructions defining the elements of a Ponzi scheme. Past descriptions of Ponzi schemes do not constitute binding legal definitions. *See Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions.").

*Rsch. & Tech. Grp., Inc. (In re AgriTech)*, 916 F.2d 528, 535 (9th Cir. 1990).

This presumption, importantly, involves two steps: first, proving the existence of a Ponzi scheme; and second applying the Ponzi scheme presumption as a matter of law under § 548(a)(1)(A) to infer that transfers were made with an "actual intent" to defraud. *See, e.g.*, *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008) ("*[O]nce the existence of a Ponzi scheme is established*, . . . funds transferred . . . are deemed to be fraudulent transfers as a matter of law." (emphasis added)). It may be appropriate for a sophisticated finder of fact, such as a bankruptcy judge, who knows that fraudulent intent is an essential element of actual fraud, to apply such a presumption.

In this case, though, the finder of fact was a jury. It did not know that intent was an element of fraud. The jury was only instructed on step two of the Ponzi scheme presumption. Specifically, the jury was instructed:

> For the purposes of proving a fraudulent transfer, EPD and Pressman's actual intent to hinder, delay, or defraud creditors is established if Plaintiff proves that EPD operated as a Ponzi scheme.

So, the jury knew that *if* it found a Ponzi scheme, it could infer as a matter of law that transfers from EPD to the Kirklands were made with an "actual intent" to "hinder, delay, or defraud" creditors for purposes of § 548(a)(1)(A). The jury in the trial made a finding that EPD was a Ponzi scheme, so it is not surprising that it answered "Yes" on the verdict form to the question of whether Pressman or EPD acted "with the intent to hinder, delay, or defraud one or

more of their creditors." That the jury was required to make such a finding reflects the court's awareness that intent was a necessary element.

But the jury was not adequately instructed on what it needed to find to establish *the existence* of a Ponzi scheme under step one of the Ponzi scheme presumption. The jury was told:

> A Ponzi scheme is a financial fraud that induces investment - often by promising high, risk-free returns within a relatively short time period.  In a Ponzi scheme, payments are made to investors or lenders from later investments or loans rather than from profits of the underlying business venture. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists. Distributing funds to earlier investors from the receipt of monies from later investors or lenders is the hallmark of Ponzi schemes.

> The mere fact that a company has negative cash flows for several years is not alone sufficient to conclude that a company is a Ponzi scheme.

This instruction merely described how a Ponzi scheme functions. While it may have told the jury what was not enough to find a Ponzi scheme – losing money over several years – it did not tell the jury what was needed to find that

form of fraud. The instruction did not affirmatively delineate the legal elements of a Ponzi scheme, including, critically, wrongful intent on the part of the Ponzi scheme promoter.

Such wrongful intent can be inferred from circumstantial evidence. But at some point, the jury must be required to find fraudulent intent. In this case, the jury was instructed that it could find that intent if it found the existence of a Ponzi scheme, but it was not told that it needed to find such intent to find that there had been fraud in the form of a Ponzi scheme *in the first place*. It was instructed to find intent based on a finding of a scheme that should have required the finding of intent but did not. The instructions and the jury's conclusion based upon those instructions were circular: The jury found the existence of a Ponzi scheme without being instructed that fraudulent intent was required, and the finding of a Ponzi scheme was taken to establish fraudulent intent.

Although, as the majority notes, the instruction given did capture certain objective indicia, or "badges," commonly associated with Ponzi schemes, the instruction failed to inform the jury that these "badges" were merely proxies for inferring the requisite wrongful intent of the Ponzi scheme operator. The instruction, thus, transformed the "badges" into an irrebuttable presumption of a Ponzi scheme. The majority opinion, at 18-22, embraces that error with its holding that "[i]f those objective elements were present, as the jury found, then the jury could reasonably infer Pressman's fraudulent intent because he *must* have known that his pyramid scheme would end at some point." The jury was never instructed to use these badges to infer intent, thereby dropping fraudulent intent out of what the jury must find. The instructions, thus, permitted a finding of fraud without a finding by the jury of an essential element of fraud.

The majority further asserts, at 21, that "if the essential elements of a Ponzi scheme are truly present—consistent funneling of money from new investors to pay old investors where in fact no legitimate profit-making business opportunity exists—then the operator's actual intent to defraud his investors and knowledge that the scheme will eventually fail follows logically and necessarily." Such an inference is not inevitable here. EPD engaged in actual transactions and had assets. The majority opinion, at 7-8, acknowledges that EPD had substantial business investments, including a commercial real estate development, marketing companies, night clubs, and ice rinks, and, in addition, operated a bill-pay service for its investors. It was not simply a shell taking money in from some investors and repaying it to other prior investors. Its assets were not held in cash or in other liquid forms but were investments in assets that, it was likely hoped, would appreciate. By itself, that distinguishes EPD from the schemes of Charles Ponzi, Bernie Madoff, and others of their ilk. *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 161 (5th Cir. 2015) (holding that a business was not a Ponzi scheme where it "engaged in substantial legitimate business," despite the fact that "a portion of the funds collected . . . was used to pay Ponzi-like returns to investors"); *United States v. Treadwell*, 593 F.3d 990, 994 n.3 (9th Cir. 2010) ("[I]t is the absence of evidence of any investment of investor funds that makes 'Ponzi scheme' an apt characterization of the defendants' fraud."), *overruled on other grounds by United States v. Miller*, 953 F.3d 1095, 1103 n.10 (9th Cir. 2020). It seems far from obvious to me that Jerrold Pressman actually knew or intended to run what is understood as a Ponzi scheme. That becomes even less certain when viewed as of the time of its operation.

The majority opinion accurately describes the fact of the financial collapse of EPD in 2009, but it fails to recognize the significance of that date. The passage of time may have dimmed memories, but it is important to appreciate that Pressman's enterprise was far from alone in experiencing financial distress at that time. That period came to be known as "the Great Recession," during which many businesses failed.

Economic conditions at that time were succinctly described in a paper later published by the Federal Reserve: "Lasting from December 2007 to June 2009, this economic downturn was the longest since World War II." It continued:

> The Great Recession began in December 2007 and ended in June 2009, which makes it the longest recession since World War II. Beyond its duration, the Great Recession was notably severe in several respects. Real gross domestic product (GDP) fell 4.3 percent from its peak in 2007Q4 to its trough in 2009Q2, the largest decline in the postwar era (based on data as of October 2013). The unemployment rate, which was 5 percent in December 2007, rose to 9.5 percent in June 2009, and peaked at 10 percent in October 2009.
>
> The financial effects of the Great Recession were similarly outsized: Home prices fell approximately 30 percent, on average, from their mid-2006 peak to mid-2009, while the S&P 500 index fell 57 percent from its October 2007 peak to its trough in March 2009. The net worth of US households and

> nonprofit organizations fell from a peak of approximately $69 trillion in 2007 to a trough of $55 trillion in 2009.

Robert Rich, *The Great Recession: December 2007–June 2009* (Nov. 22, 2013), https://www.federalreservehistory.org/essays/great-recession-of-200709 (last visited Aug. 15, 2024).

An observer for the International Monetary Fund described the economic conditions at the time in similarly dire terms:

> [T]he extraordinary intensification of the global financial crisis since the mid-September collapse of Lehman Brothers has brought back an even more ominous specter from the past—the Great Depression of the 1930s.
>
> Comparing the present financial crisis to the deepest and most devastating economic cataclysm in modern history may seem a stretch, but there is now no question that the ongoing crisis has become the most dangerous of the post–World War II era. It is not so much the depth of the downturn in individual countries—devastating financial collapses have occurred before in advanced as well as in emerging economies—but its pervasive reach into all corners of the world economy that has created a threat to global prosperity not experienced in 70 years.

Charles Collyns, *The Crisis through the Lens of History* (Dec. 2008), https://www.imf.org/external/pubs/ft/fandd/ 2008/12/collyns.htm (last visited Aug. 15, 2024).

EPD was not nearly alone in failing in 2009 or in suffering from a substantial loss in value of assets. The fact of failure at that time does not establish fraud.

Similarly, the fact that EPD was never profitable between 2003 and 2010 is not enough to establish that it was doomed to failure. Amazon and Tesla each famously failed to turn a profit for more than a decade before becoming among the most valuable corporations in the world. We cannot assume that unprofitable years made it certain that Pressman accepted a dire fate as inevitable or that by continuing his efforts he necessarily intended to defraud new investors. Viewed in that context, the financial failure of EPD was not something that Pressman necessarily viewed or understood to be inevitable.

To be clear, I am not saying that Pressman could not have been held to have known that failure was inevitable. Evidence that he continued to take money in from new investors while using it to pay out existing obligations could be sufficient to permit the jury to infer that he acted with fraudulent intent. A confession from the promoter is not required. But the jury in this case was never instructed that it needed to find fraudulent intent in order to find fraud or, specifically in this case, to find that EPD was a Ponzi scheme.

In some cases the failure to instruct the jury on the intent element might be a harmless error because the facts were such that such a finding would have been inevitable. That is not true in this case, however. As noted above, and as acknowledged by the majority opinion, EPD had substantial

investments. It had a potential to be a serious and profitable business. That it failed at a time when businesses all over the country failed does not establish that Pressmen knew that failure was inevitable.

This is not a case where there was a total "absence of evidence of any investment of investor funds," *Treadwell*, 593 F.3d at 994 n.3, and the inference of a Ponzi scheme was not inevitable given EPD's "legitimate business" lines, *In re Am. Hous. Found.*, 785 F.3d at 161. Indeed, the majority opinion acknowledges, at 27-28, that "determining whether a debtor who made some legitimate investments nevertheless operated a Ponzi scheme calls for a case-specific and fact-intensive inquiry." Such an acknowledgment is inconsistent with how the majority opinion has treated this case.

Moreover, the same jury that concluded that EPD was a "Ponzi scheme" also found that John received payment from EPD in good faith and for a reasonably equivalent value. John had served as a lawyer for Pressman and EPD. It was alleged in the action that went to trial that John knew about the Ponzi scheme. It was also alleged that he knew that the filing of a security interest on behalf of his family trust (here represented by Ann as trustee) and certain payments made by EPD on John's behalf were fraudulent conveyances. The jury rejected both of those claims. To the contrary, John was found by the jury to have acted in good faith, not knowing of any fraud. The trust assets held by Ann as trustee were assigned to the trust by John. There is no basis to conclude that Ann knew more than John did or that she did not act in good faith. The jury explicitly rejected some of the claims asserted by the Chapter 7 trustee, so it cannot properly be presumed that the jury would have made the finding of fraudulent intent that the Chapter 7 trustee's claim of a Ponzi

scheme should have required. If the lawyer for Pressman did not know of the fraud, it is not out of the question that Pressman did not intend the fraud.

In short, the district court's Ponzi scheme instructions, which never actually required the jury to find wrongful intent on the part of the Ponzi scheme promoter, failed to "fairly and adequately cover the issues presented." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). I would, therefore, vacate and remand the jury's affirmative Ponzi scheme finding.